**Carolyn B. GLASCO and, Geraldine Haney, Respondents,**

**Alfred Glasco, Appellant,**

v.

**FIRE AND CASUALTY INSURANCE CO., Respondent.**

**No. WD 37212.**

Missouri Court of Appeals,
Western District.

May 20, 1986.

David H. Bony, Lauri J. Laughland, Kansas City, for appellant.

Carl W. Bussey, Colbert & Fields, Kansas City, for respondent.

Before LOWENSTEIN, P.J., and TURNAGE and BERREY, JJ.

LOWENSTEIN, Presiding Judge.

Alfred Glasco, appeals apportionment of a settlement under an uninsured motorist policy in a wrongful death claim on behalf of his daughter Charmaine Glasco. The court awarded the bulk of the settlement to decedent's mother, Carolyn Glasco. Carolyn Glasco cross-appeals claiming the trial court erred in awarding any portion of the settlement to Alfred Glasco because Alfred failed to assert his paternity as to the decedent and suffered no loss that entitled him to any recovery under § 537.080, RSMo 1979. Carolyn and Alfred have never been married. Alfred also claims error in the trial court's failure to award him attorney's fees and in allowing evidence relating to the child's medical expenses.

Charmaine Glasco, the daughter, was severely injured in an automobile accident while riding in an uninsured vehicle on July 28, 1984. She died of those injuries three days later. At the time of the accident, Charmaine lived with her mother and grandmother, Geraldine Haney, in Kansas City, Missouri.

Prior to the accident, Fire and Casualty Insurance Company issued an automobile liability insurance policy to Geraldine, which provided uninsured motorist coverage up to $25,000 for each household member. Carolyn and Geraldine filed an Application for Order Approving Wrongful Death Settlement on April 16, 1985. Alfred intervened. The settlement was for $25,000, the policy limit.

At the settlement hearing the evidence showed Charmaine was born in February, 1964. Carolyn testified to the following: Alfred was Charmaine's father, and his name appeared on Charmaine's birth certificate. At the time of Charmaine's birth, Carolyn lived with her sister and brother-in-law. She and Alfred never married, though they did live together when Charmaine was four to eight years of age. In 1972, Carolyn and Charmaine moved into Geraldine's home and still lived there at the time of Charmaine's death. Charmaine left no surviving spouse or children. Both Carolyn and Charmaine worked at Sears. Charmaine contributed part of her income to the household and helped with household chores. From 1972 on, Carolyn received no child support from Alfred. Nor did he ever have custody of Charmaine.

Carolyn obtained health and life insurance policies on her daughter and paid $66 and $16 monthly premiums respectively on each policy. Charmaine's hospital bill came to approximately $17,500 and the doctor's fee was about $1,790. The health insurance covered 80% of these bills. At the time of the hearing, Carolyn had not been billed for any outstanding balance. The life insurance policy covered funeral expenses of $5,000.

Alfred's testimony showed he freely admitted Charmaine was his daughter, though he never legitimized her. After Carolyn and Charmaine moved to Geraldine's home, he saw Charmaine when she rode her bicycle to his house. He stated he would see her at the bus stop and drive her home. He also drove Charmaine around town. He testified he gave Charmaine money "[w]henever she wanted it," but he did not depend on Charmaine for income. He stated Charmaine never spent the night at his home. When asked if he disciplined Charmaine, Alfred replied, "I showed her how to live."

The court's judgment and order approved the $25,000 settlement. It found that Carolyn and Alfred were the sole existing persons entitled to sue or join in this wrongful death action. The court found "the biological and non-custodial father, Alfred Glasco, who had minimum contacts with the deceased child, failed to legitimize the deceased child and failed to shoulder responsibility with respect to supervision, support, protection and care of said child."

The court also found Geraldine was not entitled to any recovery and she did not appeal this ruling.

Apportionment of the settlement was as follows: Carolyn recovered 90% of the $25,000 or $22,500; Alfred recovered 10% of the $25,000 or $2,500; Carolyn's attorney fees of $7,492.50 were deducted from her recovery. The order also stated "there will be no amount ordered by this Court for" Alfred Glasco's attorney fees.

Carolyn's only point on her cross appeal necessitates that it be addressed first since she claims that Alfred was not entitled to bring a wrongful death action because he failed to assert his paternity and suffered no loss that entitled him to any recovery as delineated by § 537.080, RSMo 1979. Section 537.080 states in relevant part:

Whenever the death of a person results from any act, conduct, occurance, transaction, or circumstance which, if death had not ensued, would have entitled such person to recover damages in respect thereof, the person or party who ... would have been liable if death had not ensued shall be liable in an action for damages ... which ... may be sued for (1) By the spouse or children, natural or adopted, ligitimate or illegitimate, *or by the father or mother of the deceased, natural or adoptive.*

(Emphasis added).

The evidence at the hearing shows Alfred openly acknowledged Charmaine was his daughter. His name appeared on Charmaine's birth certificate. Moreover, Carolyn readily testified Alfred was the child's father. There simply is no factual dispute concerning whether Alfred failed to assert his paternity as to Charmaine, so the argument that Alfred is foreclosed from joining in the wrongful death action on this ground is not well taken.

The arguments in Carolyn's brief actually go to the finer issue whether Alfred's failure to take affirmative steps to legitimize the child and shoulder responsibility with respect to her upbringing precludes him from entitlement to bring or join in a wrongful death action on behalf of his illegitimate daughter.

Carolyn relies on *Cobb v. State Security Insurance Co.*, 576 S.W.2d 726 (Mo. banc 1979), for the proposition that Alfred is not entitled to bring the action even though he is the biological or natural father of Charmaine. In *Cobb*, the parents of the deceased child never married. However, the father openly acknowledged the child as his own before and after the marriage. He lived with the mother and the child at the time of the child's death. In addition, the father gave the child support, love and affection. He helped raise and discipline the child and acknowledged responsibility for hospital bills incident to the child's accident. The father in *Cobb* also purchased the insurance policy, by which the parents sought recovery under the uninsured motorist provision. *Id.* at 731–32, 736.

The question before the court in *Cobb* was whether "the biological father of an illegitimate child, as an insured under an uninsured motorist clause is legally entitled to recover damages for an action of wrongful death of his child." *Id.* at 732. The court's holding stated:

[W]e are compelled to conclude that when the biological father has openly acknowledged the child as his own, has exercised custody and has shouldered responsibility with respect to supervision, support, protection and care of the child, the biological father has a right to maintain a wrongful death action for the death of his illegitimate child.

*Id.* at 736 (citations omitted).

At first glance, the holding suggests the biological father of an illegitimate child may maintain a wrongful death action only if he satisfies the elements set out above. If this court followed such an interpretation of the holding, it would have to agree with Carolyn that Alfred was not entitled to join in the wrongful death action under § 537.080. This is because the trial court specifically found Alfred "failed to shoulder responsibility with respect to supervision, support, protection and care of said child."

However, a footnote appended to the holding stated:

Under the facts of this case we need not decide whether every biological father, after hurdling the problems of proof, is entitled to commence a wrongful death action absent the above elements. We need not go as far as *Moore v. Thunderbird, Inc., supra*—that support and contact with the child are concerned with the amount of damages, not the right to recover.

*Cobb, supra,* at 736 n. 16. Thus, the facts here place this case in the ambit of the footnote, and this court must decide whether Alfred, the biological father, is entitled to commence a wrongful death action even though he failed to shoulder responsibility for Charmaine's upbringing.

The Missouri Wrongful Death Act, § 537.080(1), RSMo 1979, provides the action may be brought "by the father or mother of the deceased, natural or adoptive." A wrongful death action is a remedy conferred strictly by statute. The statute makes no reference to the marital status as between the parents. *Higgins v. Gosney,* 435 S.W.2d 653, 657 (Mo.1969). Nor does the statute delineate the circumstances under which a biological parent can commence a wrongful death action on behalf of his illegitimate child.

■ A reading of the statute indicates the natural father is no less a parent than the natural mother. *See Wilcox v. Jones,* 346 So.2d 1037, 1038 (Fla.Ct.App.1977). "To recognize the right of the natural mother of an illegitimate child to maintain a wrongful death action but in the same breath to refuse to recognize the corresponding right of the natural father, would violate the equal protection clauses of the state and federal constitutions." *Id.*

■ The issues of Alfred's support of and contact with the child are properly concerned with proof of paternity and the amount of damages to which he as the biological father may be entitled and not with his basic right to recover under the statute. *Moore v. Thunderbird, Inc.,* 331 So.2d 555, 558 (La.Ct.App.1976). Support and contact issues can be analogized to evidentiary matters in that they go to the weight of the evidence rather than to the admissibility. As the natural father of his illegitimate deceased daughter, Alfred was entitled to maintain a wrongful death action as a matter of law.

Turning to his first point on appeal, Alfred claims error in apportionment of damages. He complains he is entitled to 50% of the recovery rather than the 10% assigned to him by the court. He contends the Missouri Supreme Court has interpreted § 537.080 "to mean that parents of a deceased child have an equal interest in the recovery," citing *Higgins v. Gosney, supra.* In essence, Alfred equates the parents' "equal interest in recovery" with an equal division of damages. His argument is without merit.

*Higgins v. Gosney, supra,* concerned a divorced noncustodial father who brought a wrongful death action on behalf of his son. The mother was killed in the same accident as the son. The defendant claimed the father did not make a submissible case in that he failed to show he suffered any pecuniary loss by failing to provide support for the child. *Id.* at 657. The court there stated § 537.080 provides that an action for the death of a child "is vested in the parents, each of whom has an equal interest in the recovery.... This is a single recovery for the equal benefit of both parents.... If either parent is deceased, the right of action and the entire recovery vests in the survivor." *Id.* at 657–58.

■ The quoted passage stands for the proposition that the "statute creates an indivisible cause of action in favor of the parents ... and allows them a single recovery for their equal benefit." *State ex rel. Slibowski v. Kimberlin,* 504 S.W.2d 237, 239 (Mo.App.1973). In other words, the claim for wrongful death is vested in both parents and creates an indivisible right.

■ Section 537.095.3, RSMo 1979, clearly authorizes the court to "enter a judgment as to ... damages, *apportioning* them among those persons entitled thereto in proportion to the losses suffered by each

as determined by the court." (Emphasis added). Once the cause of action for wrongful death, which is indivisible, becomes merged in a judgment, the interests of the mother and father then become separable. *State ex rel. Slibowski, supra,* at 241. The decision of the trial court was within the discretion granted by § 537.095.-3, and the determination of losses made by the court was amply supported by the evidence. *See Farr v. Schoeneman,* 702 S.W.2d 512, 515 (Mo.App.1985). The 90–10 split cannot be deemed an abuse of discretion since the evidence showed the father failed to support and maintained only minimum contacts with the child from 1972 until her death in 1984.

■ Alfred next finds error in the court's failure to order attorney's fees to his lawyer. Section 537.095.4(2) provides the court shall order the claimant to pay the attorney's fees as contracted. At the time the court rendered its judgment there was no evidence of a fee agreement between Alfred and his attorney. By contrast, the terms of the fee contract between Carolyn and her attorney were set out in the application for order approving settlement. Carolyn also testified to the terms of the agreement. As far as this court can discern, the first mention of a contract whereby the attorney would receive one-third of Alfred's recovery appears in his brief. The point is denied.

■ In his last point, Alfred contends the trial court prejudicially erred in overruling his objection to the introduction of evidence of the child's medical expenses in that it was not shown they were reasonable and necessary. The court made no findings regarding medical expenses. The court based its apportionment of damages on its findings that Alfred "had minimum contacts with the deceased child ... and failed to shoulder responsibility with respect to supervision, support, protection and care of said child." This point is also denied.

The judgment is affirmed in all respects.

GAITAN, J., not a member of the Court when the case was submitted.